## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KENNETH JUNHO BAE, LYDIA YUJIN
BAE, JONATHAN SANG-OU
BAE, NATALIE HAEJIN BAE,
TERRI SUHYUN CHUNG,

       Plaintiffs,

v.                             CIVIL ACTION NO: 20-cv-2260

DEMOCRATIC PEOPLE'S REPUBLIC
OF KOREA,
c/o Foreign Minister Ri Son-Gwon
Ministry of Foreign Affairs
Jungsong-Dong, Central District
Pyongyang, DPRK

       Defendant.

_____/

## COMPLAINT

Come now the Plaintiffs, Kenneth Junho Bae, Lydia Yujin Bae, Jonathan Sang-Ou Bae,

Natalie Haejin Bae, and Terri Suhyun Chung, and bring suit against the Democratic People's

Republic of Korea (referred to herein as "North Korea") pursuant to the Foreign Sovereign

Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*, for injuries suffered by each of them as a

result of North Korea's unlawful acts of hostage taking, torture, and other violations of the FSIA,

and would show as follows:

### PARTIES

1.     Plaintiff Kenneth Junho Bae is a U.S. citizen and has been a U.S. citizen since

October 10, 1991. Kenneth Junho Bae, who currently resides in Seoul, South Korea, was

imprisoned and tortured by the North Korean government.

2.      Lydia Yujin Bae is married to Kenneth Junho Bae and was married to him both before and during his imprisonment. Lydia Bae was a Chinese citizen at the time of the events giving rise to this complaint, but is currently a U.S. citizen and has been a U.S. citizen since February 16, 2018. She currently resides with Kenneth Junho Bae in Seoul, South Korea.

3.      Jonathan Sang-Ou Bae is the son of Kenneth Junho Bae and Kenneth's prior wife, Ana Dorcas Bae. He is and was a U.S. citizen at all relevant times, and currently resides in Chicago, Illinois.

4.      Natalie Haejin Bae is the daughter of Kenneth Junho Bae and Kenneth's prior wife, Ana Dorcas Bae. She is and was a U.S. citizen at all relevant times and currently resides in Tucson, Arizona.

5.      Terri Suhyun Chung is Kenneth Junho Bae's sister. She has been a U.S. citizen since October 10, 1991 and currently resides in Edmonds, Washington.

6.      North Korea is a foreign sovereign that has been designated a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App § 2405(j)).  North Korea was so designated during the occurrence of the matters described in this complaint and continues to be so designated to this date.

JURISDICTION AND VENUE

7.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1330 and 1331 and 28 U.S.C. § 1605A.

8.      This action falls within the "terrorism exception" to sovereign immunity under the FSIA, 28 U.S.C. § 1605A(a)(1), which provides, in relevant part, that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by

an act of torture . . . [or] hostage taking . . . if such act . . . is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."

9.      Under the terrorism exception to the FSIA, torture is defined to "have the meaning given . . . in section 3 of the Torture Victim Protection Act of 1991 (28 U.S.C. 1350 note)." 28 U.S.C. § 1605A(h)(7). The Torture Victim Protection Act defines torture as "any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind." Pub. L. No. 102-256, § 3(b)(1), 106 Stat. 73, 73 (1992), *codified at* 28 U.S.C. § 1350 (note).

10.      Further, seizing an individual in an effort to extract concessions from the United States is hostage taking within the definition of the FSIA.  *See, e.g., Massie v. Gov't of Democratic People's Republic of Korea*, 592 F. Supp. 2d 57, 67–69, 74 (D.D.C. 2008); *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 25 (D.D.C. 2001).   A plaintiff need not show that the hostage taker actually extracted such concessions, or even that it communicated its intent to the United States. *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 470 F.3d 356, 357 (D.C. Cir. 2006).

11.     This suit seeks money damages against North Korea and its agencies and instrumentalities for injury and harm caused to the Plaintiffs by North Korea's acts of terrorism, torture, and hostage taking.

12.     These acts of terrorism, torture, and hostage taking were perpetrated by officials, members, agents and instrumentalities of North Korea while acting within the scope of their official capacities.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(f)(4).

STATEMENT OF FACTS

14.     Kenneth Junho Bae is a U.S. citizen currently residing in Seoul, South Korea.

15.     Kenneth attended high school in Torrance, California and college at the University of Oregon. He then received a Masters of Divinity from Covenant Theological Seminary in 2002 and became a licensed preacher in the Presbyterian Church in America and an ordained Southern Baptist pastor in May, 2007.

16.     As part of his work as a minister, Kenneth began working with Youth With A Mission, a Christian missionary and outreach group, in 2005 and continues to do so to this day.

17.     In addition to his work as a minister, Kenneth has held various jobs in sales and marketing since 1989. Specifically, Kenneth worked as a district sales manager at Vector Marketing Corporation and a sales representative at Verizon Wireless Corporation prior to moving to China.

18.     In 2006, Kenneth moved to China with Jonathan where Jonathan spent one year before returning to the United States.

19.     While in China, Kenneth started a cultural exchange and tour company that specialized in tours to North Korea.

4

20.     Over the course of two years, Kenneth arranged and led approximately 17 trips to North Korea from China, all without incident. In total, Kenneth led approximately 300 Christian tourists to North Korea, prior to his captivity.

21.     Kenneth left for his 18th trip to North Korea on November 1st, 2012. He was leading a group of four tourists on a six-day trip to North Korea. The purpose of the trip was to bring Christian tourists to North Korea to see the country and lead prayer meetings and worship services among the tourists and on behalf of the North Korean people.

22.     On November 3, 2012, at the North Korean border, a North Korean customs officer discovered a portable computer hard drive in Kenneth's bag. The customs officer searched the computer hard drive and found documentary films about North Korea. The films were produced by western media.

23.     Kenneth was arrested for bringing in materials deemed harmful to the North Korean regime.

24.     After being held at the border and questioned by a North Korean customs officer, Kenneth was initially let go, allowed to leave with the group of tourists he brought to North Korea. After arriving at the hotel few hours later, a black compact car showed up at the hotel parking lot, and Kenneth was taken from the lot and was sent to a remote hotel that was used as an interrogation facility by the National Security Bureau.

25.     After his arrival at the facility, Kenneth's shoes and pants were removed during a month-long interrogation period. Kenneth was put into the room without heat for the first few days and forced to confess that he was trying to overthrow the government of North Korea through prayer and worship. He was given extremely small meals and was only allowed to sleep 2-3 hours a day. He underwent intense and rigorous interrogation from North Korean authorities,

who made him stand still in a room all day.  Once, Kenneth was forced to kneel on a concrete floor for hours on end, which caused unbearable pain. He was threatened that they would cut off his head and bury it and no one would be able to recover his body if he does not cooperate with them. After being detained and undergoing one month of interrogation by the National Security Bureau, Kenneth had to sign a confession that he was trying to overthrow the government of North Korea through prayer and worship. Kenneth finally signed the confession because North Korea authority told him that he would be taken to Pyongyang first and then he would be released if he signed the confession.

26.     Kenneth was sent to Pyongyang after a month-long investigation. He thought that he would be released as promised but instead, he was charged with attempting to overthrow the government of North Korea through prayer and worship; attempting to start a prayer center inside of North Korea; and dishonoring the leader's name by telling the Christian tourists that North Korea was responsible for starting the Korean War. A North Korean official told Kenneth that missionaries like Kenneth were the most severe threat to the North Korean regime, and they accused Kenneth of trying to infect the North Korean people with the Christian virus, which would cause the people to stop worshipping their leader, Kim Il-Sung.

27.     Kenneth was labeled as a religious terrorist by the North Korean government and was sentenced to the death penalty or life in prison during his pre-trial period.

28.     Kenneth tried to deny all charges against him, but North Korean official threatened that Kenneth would be taken to the square and shot and killed if he continued to deny charges.

29.     North Korean officials offered Kenneth an attorney to represent him, but when Kenneth asked to meet with his attorney, he was told that he would not be able to see his attorney until the trial.

30.     At trial, Kenneth declined to be represented by the appointed attorney since it was evident that the attorney was a representative of the North Korean government.

31.     The trial lasted for only 90 minutes, and Kenneth was convicted of all charges and sentenced to 15 years of imprisonment and hard labor. He was not given any appeal rights or rights to a new trial.

32.     While in holding facilities in Rason and Pyongyang prior to the trial, the North Korean government mentally and psychologically tortured Kenneth.

33.     Kenneth was sent to a labor camp that was specialized for foreigners, and he became the first American prisoner who was sent to the prison since the Korean War.

34.     While at a labor camp, Kenneth was forced to do extremely hard labor—carrying rocks, digging holes, and carrying and smashing coal—for 10 hours straight, 6 days a week.

35.     Because of his work at the labor camp, Kenneth lost 50 pounds in the first three months of his imprisonment and was eventually sent to the hospital for malnutrition.

36.     A prosecutor for the North Korean government visited Kenneth at the labor camp. The prosecutor told him that he had been forgotten by the U.S. government, that Kenneth would never be able to go home, and that he would die in prison. This prosecutor visited him every Saturday for more than a year and repeated his remark that Kenneth must stay in a labor camp for 15 years and suffer.

37.     During his imprisonment, each time the prosecutor visited, Kenneth became extremely discouraged and severely depressed.

38.     Kenneth was isolated for most of his imprisonment and went 735 days without having any contact with other prisoners. He ate more than 2,200 meals alone.

39.     As a response to Kenneth's imprisonment, his family engaged in extensive efforts to advocate for his release and for the U.S. government's diplomatic involvement.

40.     Throughout Kenneth's captivity, his sister, Terri Suhyun Chung, became the primary advocate and media spokesperson on his behalf and appealed to U.S. government officials to secure his release.

41.     Terri and other members of the family participated in numerous interviews with news outlets to raise awareness of Kenneth's captivity. Terri and the family also engaged in weekly communication with the State Department, met with congressional leaders, and communicated with the President's office.

42.     Additionally, Jonathan started a petition to President Obama at Change.org to advocate for Kenneth's release. The petition ultimately received over 176,000 signatures. Jonathan travelled to Washington D.C. with other members of Kenneth's family to advocate in person for U.S. intervention. During the trip, Kenneth's family members met with representatives Alan Grayson, Raul Grijalva, Rick Larson, and Charles Rangel; senators John McCain, Maria Cantwell, and Patty Murray; and Secretary of State John Kerry.

43.     The family also reached out to prominent Americans who were in a position to negotiate with North Korea, including Reverend Jesse Jackson, and Bill Richardson, the former Governor of New Mexico, who had previously negotiated the release of an American detainee in North Korea.

44.     Because of the proximity of her home and business to the North Korean border, Lydia had to remain silent. Throughout Kenneth's captivity, the North Korean government

hacked into Lydia's computer and monitored her phone. She lived in fear for her own safety, as well as Kenneth's, and struggled to maintain her business.

45.    On November 8, 2014, after being detained and imprisoned for 735 days, Kenneth was finally released by special pardon by Kim Jung Eun. Kenneth's release was negotiated by James Clapper, who was sent as a special envoy by the United States.

46.    Kenneth suffered lasting physical, emotional, and psychological harm from his captivity. He had to seek and receive counseling and was unable to work for two years after he returned from captivity.

47.    Kenneth also received medical treatment after his captivity for diabetes and pain in his neck and back, and had to receive prostate and bladder surgery. He told North Korean officials about his medical problems while he was in captivity and requested treatment, but his request was denied. This denial of treatment exacerbated Kenneth's health conditions. He was forced to do the hard labor regardless of his medical condition.

48.    Before Kenneth was sent to the labor camp, he was given a medical examination to determine whether he would be fit to endure the hard labor. The doctor reported to the officials that Kenneth was not fit to carry out the sentence due to his medical and physical condition. However, the North Korean government ignored the doctor's report and sent Kenneth to the labor camp, which exacerbated Kenneth's physical condition to a life-threatening stage.

49.    Upon his return, Kenneth received counseling to cope with the trauma of his imprisonment, and he continues to receive counselling to this day. Likewise, Kenneth's wife, Lydia, daughter, Natalie, and sister, Terri, have all also received counseling and therapy because of the psychological impact of Kenneth's captivity. Furthermore, since the time of Kenneth's

captivity, his son Jonathan suffered emotionally, resulting in unemployment and underemployment.

## COUNT ONE

### Intentional Infliction of Emotional
### Distress/Solatium for Kenneth Bae

50.     Plaintiffs incorporate by reference all prior paragraphs of this complaint.

51.     Kenneth Junho Bae is entitled to solatium damages because of North Korea's torture and hostage taking, pursuant to 28 U.S.C. § 1605A(c).

52.     North Korea held Kenneth Junho Bae captive for 735 days.

53.     During that time, North Korea tortured Kenneth by intentionally inflicting upon him severe mental and physical pain and suffering, including the severe mental suffering caused by the threat of imminent death.

54.     North Korea also engaged in hostage taking by detaining, continuing to detain, and threatening to kill or injure Kenneth in order to exert influence on the United States.

55.     Further, the captivity has had lasting effects on Kenneth's marriage. His two-year captivity strained his relationship with Lydia, and they have had to seek professional marriage counselling.

56.     As a consequence of North Korea's torture and hostage-taking, Kenneth suffered permanent physical injuries and severe and permanent psychological and emotional harm and is entitled to compensation for those physical injuries and is entitled to solatium damages pursuant to 28 U.S.C. 1605A(c).

## COUNT TWO

**Economic Damages for Kenneth Junho Bae**

57.     Plaintiffs incorporate by reference paragraphs one through forty-nine as if set forth fully herein.

58.     North Korea's torture of Kenneth Junho Bae and its use of Kenneth as a hostage have caused Kenneth significant financial damages. These damages were the foreseeable and predictable result of North Korea's holding him hostage.

59.     Additionally, Kenneth has incurred medical expenses caused by the harsh and brutal conditions of his imprisonment. Specifically, Kenneth has suffered from back and neck pain since returning to the United States and has been hospitalized for the pain. These injuries are continuing and permanent and will likely require surgery.

60.     Kenneth's damages include the loss of all income for the 735 days he was held captive, as well as lost future earnings because of the interruption in his career and lasting psychological impact of his captivity.

## COUNT THREE

**Intentional Infliction of Emotional
Distress/Solatium for Lydia Yujin Bae**

61.     Plaintiffs incorporate by reference paragraphs one through forty-nine as if set forth fully herein.

62.     By torturing Kenneth Junho Bae and holding him hostage, North Korea intentionally and recklessly inflicted extreme emotional distress on his wife, Lydia Yujin Bae. Lydia suffered extreme depression while also having to care for the ministry and the company

that Kenneth left behind, who were grieving Kenneth's captivity.  The emotional pain and suffering which she sustained has caused her permanent psychological and emotional damage.

63.     Lydia Yujin Bae has been receiving ongoing counseling even to this day.

64.     Further, the two years of separation caused by Kenneth's captivity has created a strain on the marriage, and Lydia and Kenneth have had to seek marriage counselling.

65.     Lydia Yujin Bae's emotional distress and suffering is the direct and foreseeable result of North Korea's actions and its use of torture and hostage taking. North Korea is, therefore, responsible for damages caused by her emotional distress and suffering.

## COUNT FOUR

### Economic Damages for Lydia Yujin Bae

66.     Plaintiffs incorporate by reference paragraphs one through forty-nine as if set forth fully herein.

67.     North Korea's holding Kenneth Junho Bae captive caused Lydia Yujin Bae financial damages.

68.     During Kenneth Junho Bae's captivity, Lydia's business suffered because of her state of depression, and because of the lost revenue from her regular customers. Lydia owned a Korean traditional dress store in Dandong, China near the border of North Korea. Her primary clientele were North Korean business people.  During and after Kenneth's captivity, her North Korean customers were afraid to come to her store, which caused a sharp decline in business.

69.     While Kenneth was being detained in North Korea, Lydia's computer was hacked, her phone was monitored, and she could not operate her business as usual. Her business tremendously suffered financially for two years and even after Kenneth returned to U.S.  She was

forced to close one of the stores and she had to abandon her store and come to U.S. to be with

Kenneth.

70.     These expenditures and losses are the direct and foreseeable result of North Korea

torture and hostage taking of Kenneth Junho Bae and are damages for which she makes claim.

## COUNT FIVE

### Intentional Infliction of Emotional
### Distress/Solatium for Jonathan Sang-Ou Bae and Natalie Haejin Bae

71.     Plaintiffs incorporate by reference paragraphs one through forty-nine as if set

forth fully herein.

72.     Jonathan Sang-Ou Bae and Natalie Haejin Bae are entitled to solatium damages

caused by North Korea's torture and hostage taking of their father, Kenneth Junho Bae, pursuant

to 28 U.S.C. § 1605A(c).

73.     Throughout Kenneth's captivity, Jonathan and Natalie were aware of their

captivity and advocated for his release. They suffered depression and emotional hardship caused

by their father's captivity.

74.     Before his captivity, Jonathan and Natalie enjoyed a healthy, loving relationship

with their father and spent time with him regularly. During his captivity, they were deprived of

almost all contact with him.

75.     During Kenneth's captivity, Jonathan engaged in extensive efforts to advocate for

Kenneth's release, including organizing a Change.org petition that received over 176,000

signatures, reaching out to various legislative figures and the State Department, and travelling to

Washington D.C. to meet with political figures to encourage U.S. intervention in his father's

case.

76.     Likewise, Natalie assisted in the family's advocacy for Kenneth's release and experienced the stress and anxiety that such advocacy causes.

77.     Jonathan suffered from severe depression and anxiety. Although he was previously gainfully employed, he was unable to hold a job during his father's captivity.

78.     Natalie suffered from severe depression and anxiety, as well, and had to seek psychiatric treatment and counseling during and after Kenneth's captivity. Natalie was also forced to withdraw from the University of Arizona because her depression and anxiety prevented her from continuing classes.

79.     Jonathan and Natalie are entitled to recover solatium damages for deprivation of the love and companionship of their father during the time of his captivity; for fear and emotional and psychological suffering during his captivity; and for the lasting effects the imprisonment had on their relationship with their father.  The damages are permanent and will continue into the future.

80.     Because the damages described above are the direct and foreseeable consequences of North Korea's use of torture and hostage taking, North Korea is responsible for these damages pursuant to 28 U.S.C. § 1605A(c).

## COUNT SIX

### Economic Damages for Jonathan Sang-Ou Bae

81.     Plaintiffs incorporate by reference paragraphs one through forty-nine as if set forth fully herein.

82.     North Korea's holding Kenneth Bae captive caused Jonathan Bae financial damages.

83.   Because of the severe emotional distress and anxiety caused by his father's captivity, Jonathan was unable to maintain consistent employment, like he had prior to Kenneth's captivity. Jonathan lost his job in wireless sales and was fired from another job. Jonathan was unemployed for approximately a year, until he was able to secure a job as a valet.

84.   The year of unemployment caused Jonathan a loss of income and was harmful to the progression of his career in wireless sales.

85.   These expenditures and losses are the direct and foreseeable result of North Korea torture and hostage taking of Kenneth Bae and are damages for which he makes claim.

## COUNT SEVEN

### Economic Damages for Natalie Haejin Bae

86.   Plaintiffs incorporate by reference paragraphs one through forty-nine as if set forth fully herein.

87.   North Korea's holding Kenneth Junho Bae captive caused Natalie Bae financial damages.

88.   During Kenneth's captivity, Natalie was forced to work a part-time job while in high school in order to help support the family. To do so, she was required to quit extracurricular activities, including track and field. Natalie was a promising prospect for an athletic scholarship to college for track and field. She lost the opportunity to receive athletic scholarships when she stopped participating in extracurricular events to help support her family.

89.   These expenditures and losses are the direct and foreseeable result of North Korea torture and hostage taking of Kenneth Junho Bae and are damages for which she makes claim.

## COUNT EIGHT

### Intentional Infliction of Emotional
### Distress/Solatium for Terri Suhyun Chung

90.     Plaintiffs incorporate by reference paragraphs one through forty-nine as if set forth fully herein.

91.     Terri Suhyun Chung is entitled to solatium damages caused by North Korea's torture and hostage taking of her brother, Kenneth Junho Bae, pursuant to 28 U.S.C. § 1605A(c).

92.     Throughout Kenneth's captivity, Terri was the main advocate and media spokesperson for Kenneth's release. Terri participated in weekly communication with State Department officials, reached out to congressional leaders and the President's office, and worked with experts for advocacy in North Korea. She conducted countless interviews in local and national news media to raise awareness of Kenneth's case. Terri did all of this while holding a full-time teaching job and raising two minor children. Ultimately, the extreme amount of stress caused her to take partial unpaid leave and medical leave from her teaching job.

93.     Terri Suhyun Chung has been receiving counseling for emotional distress caused by the captivity of her brother, Kenneth Junho Bae.

94.     Terri Suhyun Chung is entitled to recover solatium damages for the emotional trauma caused by the captivity of her brother, Kenneth Junho Bae.

95.     Because the damages described above are the direct and foreseeable consequences of North Korea's use of torture and hostage taking, North Korea is responsible for these damages pursuant to 28 U.S.C. § 1605A(c).

## COUNT NINE

### Economic Damages for Terri Suhyun Chung

96.     Plaintiffs incorporate by reference paragraphs one through forty-nine as if set forth fully herein.

97.     North Korea's holding Kenneth Junho Bae captive caused Terri Suhyun Chung financial damages.

98.     Throughout Kenneth's imprisonment, Terri served as the primary advocate for Kenneth and the entire family. Terri was forced to incur out-of-pocket expenses in her advocacy for Kenneth's release and in her campaign for the U.S. government's involvement.

99.     Additionally, because of the demands of her advocacy, Terri was unable to continue in her full-time teaching job and had to take unpaid leave and medical leave, and in doing so, was unable to earn the wages she otherwise would have earned.

100.    These expenditures and losses are the direct and foreseeable result of North Korea torture and hostage taking of Kenneth Junho Bae and are damages for which she makes claim.

## COUNT TEN

### Punitive Damages for Kenneth Junho Bae, Lydia Yujin Bae,
### Jonathan Sang-Ou Bae, Natalie Haejin Bae, and Terri Suhyun Chung

101.    Plaintiffs incorporate by reference paragraphs one through forty-nine as if set forth fully herein.

102.    Plaintiffs, and each of them, are entitled to punitive damages under 28 U.S.C. § 1605A(c) for North Korea's unlawful torture and hostage taking of Kenneth Junho Bae.

103.    North Korea's conduct in carrying out its unlawful torture and hostage taking was outrageous, malicious, and in willful and wanton disregard of Plaintiffs' rights. Accordingly, Plaintiffs are entitled to punitive damages against North Korea.

## **REQUEST FOR RELIEF**

WHEREFORE, the Plaintiffs, respectfully requests the following damages and relief:

a.      Kenneth Junho Bae is entitled to solatium damages for the intentional infliction of emotional distress suffered as a result of North Korea's use of torture and hostage taking.

b.      Kenneth Junho Bae is entitled to compensatory damages for the economic losses caused by North Korea's use of torture and hostage taking.

c.      Lydia Yujin Bae is entitled to solatium damages for the intentional infliction of emotional distress suffered as a result of North Korea's use of torture and hostage taking.

d.      Lydia Yujin Bae is entitled to compensatory damages for the economic loss caused by North Korea's use of torture and hostage taking.

e.      Jonathan Sang-Ou Bae and Natalie Haejin Bae are entitled to solatium damages for the intentional infliction of emotional distress suffered as a result of North Korea's use of torture and hostage taking.

f.      Jonathan Sang-Ou Bae is entitled to compensatory damages for the economic loss caused by North Korea's use of torture and hostage taking.

g.      Natalie Haejin Bae is entitled to compensatory damages for the economic loss caused by North Korea's use of torture and hostage taking.

h.      Terri Suhyun Chung is entitled to solatium damages and economic damages for the intentional infliction of emotional distress suffered as a result of North Korea's use of torture and hostage taking.

i.      Terri Suhyun Chung is entitled to compensatory damages for the economic loss caused by North Korea's use of torture and hostage taking.

j.      All Plaintiffs are entitled to punitive damages pursuant to 28 U.S.C. § 1605A(c).

k.      All Plaintiffs are entitled to their full costs and attorneys' fees as incidental

damages.

l.      The Court should award such further relief as it deems just and proper.

m.      The damages for each of the plaintiffs are permanent and will continue into the

future.

Respectfully submitted,

/s/ J. Nixon Daniel, III
J. Nixon Daniel, III
D.C. Bar No. FL0031
jnd@beggslane.com
David L. McGee
D.C. Bar No. FL0037
dlm@beggslane.com
Matthew P. Massey
D.C Bar No. 1023608
mpm@beggslane.com
Adam L. Royal
D.C. Bar No. FL0038
alr@beggslane.com
Beggs & Lane, RLLP
501 Commendencia Street
Pensacola, FL 32502
(850) 432-2451
Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that pursuant to 28 U.S.C. § 1608(3), plaintiff is sending a copy of the summons and complaint and a notice of suit, together with a translation of each into Korean, the official language of the Democratic People's Republic of North Korea, by form of mail requiring a signed receipt, addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the Democratic People's Republic of North Korea at:

      DEMOCRATIC PEOPLE'S REPUBLIC
      OF KOREA,
      c/o Foreign Minister Ri Son-Gwon
      Ministry of Foreign Affairs
      Jungsong-Dong, Central District
      Pyongyang, DPRK

*/s/ J. Nixon Daniel, III*
J. Nixon Daniel, III
D.C. Bar No. FL0031