# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

KENNETH JUNHO BAE, LYDIA YUJIN
BAE, JONATHAN SANG-OU
BAE, NATALIE HAEJIN BAE, and
TERRI SUHYUN CHUNG,

       Plaintiffs,

v.

DEMOCRATIC PEOPLE'S REPUBLIC
OF KOREA,
c/o Foreign Minister Ri Son-Gwon
Ministry of Foreign Affairs
Jungsong-Dong, Central District
Pyongyang, DPRK,

       Defendant.

       CIVIL ACTION NO.:
       1:20-cv-02260-EGS

_____/

## MOTION FOR DEFAULT JUDGMENT

Plaintiffs move this Court for entry of a default judgment against Defendant,

the Democratic People's Republic of Korea ("DPRK") pursuant to Civ. R. 55(b)(2).

In support, Plaintiffs state:

## I.    FACTUAL BACKGROUND

The Plaintiffs in this action are Kenneth Junho Bae; his wife Lydia Yujin Bae;

his children, Joathan Sang-Ou Bae and Natalie Haejin Bae; and his sister, Terri

Suhyun Chung.  This claim arises out of the arrest and imprisonment of Kenneth

Bae from November 3, 2012 to November 8, 2014 by the DPRK.  (ECF No. 1)

**A. Kenneth Junho Bae**
**1. Prior to Arrest**

Mr. Bae was born on August 1, 1968, in South Korea.  When he was 16 years old his family moved to the United States, settling in San Jose, California then relocating to Torrence, California.  He graduated from West High School in Torrence in 1988.  He then studied at the University of Oregon, in Eugene, Oregon, majoring in psychology and minoring in Chinese, in preparation for possible ministerial work in China.

Mr. Bae later returned to study at San Francisco Bible College from which he graduated in 1996.  He earned a Master of Divinity degree in 2002 from Covenant Theological Seminary.  He is a licensed minister in the Presbyterian Church in America (PCA) and is an ordained Southern Baptist Minister.  Mr. Bae became a United States citizen on October 10, 1991, and has continued to be a citizen of the United States since that date.

In 2006, Mr. Bae moved to China, with his family, and established CJ Global Culture Exchange Corporation, Ltd.  He later changed the name of the company to Nations Travel Consulting Corporation, Ltd., a China based tour company specializing in tours of North Korea for international Christian communities across the world.  Prior to his arrest, he had led approximately 300 Christian tours to the DPRK to see the land, to pray for the people of North Korea and to worship with

2

those people even though they were not allowed to worship any deity, and could only worship the person Kim Il Sung.

Mr. Bae met his wife, Lydia Yujin, while working as a missionary in China. They were married on January 17, 2009, in Dalian, China.

*See* Declaration of Kenneth Junho Bae, Ex. 1, ¶¶ 1, 2,; *See* Declaration of Lydia Yujin Bae, Ex. 2, ¶ 1.

### 2. Arrest

In November 2012, Mr. Bae had been leading groups of tourists to the DPRK for two years. On his 18th trip he inadvertently left a hard drive on a laptop computer which he took into the DPRK. At the DPRK border, a customs officer discovered the hard drive which contained documentary films regarding North Korea that were produced by western media along with missionary support letters and reports of his mission work in both China and North Korea. Because he had in his possession those materials and because he was leading Christians touring the DPRK, Mr. Bae was arrested and charged with attempting to overthrow the DPRK government. The charges against him included the following:

1. Attempting to overthrow the government of the DPRK by bringing Christians to pray and worship;

2. Attempting to start a prayer center inside the DPRK;

3. Dishonoring the leader's name by telling the tourists that it was the DPRK that started the Korean War and that President Kim Il Sung was responsible for starting the war that cost more than three million lives;

4.    Setting up bases in China for the purpose of toppling the DPRK;

5.    Bringing people into the DPRK to pray while disguising them as tourists;

6.    Encouraging the citizens of the DPRK to bring down the government;

7.    Conducting a malignant smear campaign against the government of the DPRK and its Supreme Leader; and

8.    Being a religious terrorist who wanted to bring down the government of the DPRK.

*See* Declaration of Kenneth Junho Bae, Ex. 1, ¶¶ 5-6.

### 3. Local Jail and Initial Interrogation

Following his arrest, Mr. Bae was taken to a local jail in Rason where a DPRK government official interrogated him and told him that the government of the DPRK was not afraid of the nuclear weapons of the United States because the United States would never make a preemptive strike against North Korea. However, a missionary like Mr. Bae could enter into their country and infect the people with the Christian "virus." The people would be infected, the virus would spread, and the people would no longer worship their leader, Kim Il Sung. Everyone would then turn to God and their country would become a Christian country. Therefore, according to the DPRK official, Mr. Bae was the most dangerous American criminal who had been apprehended since the Korean War because he brought Christians disguised as tourists into North Korea and was training the DPRK citizens to become Christians to spread the virus.

In December, 2012, Mr. Bae was moved from Rason to Pyongyang where the pre-trial procedure regarding his case began.  Prior to his truncated trial, Mr. Bae was regularly interrogated.  The interrogation included efforts by the DPRK to have him confess to being an agent of the United States government acting with the intent to overthrow the DPRK government.  For five months he was kept in a holding facility for foreigners who had allegedly committed crimes.  Following a meager breakfast each day, he was required to sit in a chair from 8:00 a.m. to 10:00 p.m. while guards stood outside the door waiting for a DPRK prosecutor to come and interrogate him.

The prosecution's interrogations were both psychological and physical torture.  Mr. Bae was given small meals during the day and allowed to sleep no more than two or three hours a day.  He was made to stand in the interrogation room all day on occasions.  On one occasion he was made to kneel on the concrete floor for several hours.  Kneeling on the floor caused unbearable pain and was part of the physical torture to which he was exposed.  He was often threatened with death and was told that he would be killed by decapitation and that his body would be buried so that no one would be able to recover it.  The DPRK officials also told him that if he did not cooperate and admit to the charges against him, he would be taken to a public square and shot the following day.

*See* Declaration of Kenneth Junho Bae, Ex. 1, ¶¶ 7- 9.

### 4. Trial

In April 2013, Mr. Bae was tried. He was offered an attorney who was employed by the DPRK, but was not allowed to speak to that attorney until the actual trial. He ultimately declined to have an attorney as it clear to him that any lawyer appointed would not represent his interests.

The only witness in the trial was Songyi, a North Korean who was arrested in concurrently with Mr. Bae's arrest. Songyi testified that she was encouraged by Mr. Bae to start a Christian orphanage in North Korea. The truth was that she wanted to start the orphanage and wanted Mr. Bae's support. Mr. Bae told the judge that he thought that he had been arrested because of his faith in God and that Kim Il Sung had said that as long as people genuinely wanted a better life, he would work with them even if they had different views or religious beliefs. The trial of his case lasted less than ninety minutes. Mr. Bae was convicted of the charges brought against him and sentenced to fifteen years of hard labor in the DPRK labor camp.

*See* Declaration of Kenneth Junho Bae, Ex. 1, ⁋ 10.

### 5. Labor Camp

Ultimately, Mr. Bae was sent to a labor camp. He was the only prisoner at the labor camp, working and eating in solitude except for those who guarded him. A DPRK prosecutor went to the camp every week to interrogate him and to continue the mental torture. Mr. Bae was told that he had been forgotten by the United States

government and he would not be allowed to go home.  He was told he would suffer and die at the labor camp.  Each time the prosecutor came to see him, Mr. Bae would be disappointed by the fact that there was no apparent effort to secure his release. As hope appeared to vanish, he fell into a deep depression.

During his time spent in prison Mr. Bae was required to watch the DPRK propaganda programming on Sundays from 9:00 a.m. to 10:00 p.m., thirteen hours each Sunday.  He was also required to read books and newspapers about the DPRK ideology called Ju Che (self-reliance).  Both the propaganda television and the required readings furthered the mental torture and indoctrination the DPRK sought to impose, deepening Mr. Bae's depression at the same time.

During his time at the labor camp Mr. Bae was isolated and ate more than 2200 meals alone.  He had no contact with other prisoners for the 735 days that he was held in prison.  He was used as a political pawn by the DPRK in an effort to extract political and economic concessions from the United States.  He was told that the DPRK government wanted an ex-President or cabinet-level member of the United States government to come to the DPRK, apologize for his acts to overthrow the government of the DPRK and compensate the DPRK for the wrong it had endured.  The DPRK officials wanted someone like former President Clinton to come to his rescue and apologize on behalf of the people and government of the United States. When the DPRK authorities did not like the response of the United

States government to its demands, it would cut off Mr. Bae's contact with his family members and would withhold letters from the family and from others around the world.  His depression and feeling of hopelessness would deepen as a result.

It is important to note that the decades long negotiations between the DPRK and the United States to halt North Korea's nuclear and missile program fell apart in 2012 when North Korea launched a rocket and displayed road-mobile ICBMs at a military parade.  Shortly thereafter the DPRK resumed nuclear testing in 2013 and Mr. Bae became a political pawn for the DPRK to use in order to gain recognition and concessions from the United States.

While Mr. Bae was mentally tortured, he physically suffered as well.  He was required to perform manual labor from 8:00 a.m. to 6:00 p.m., six days a week.  The manual labor included carrying rocks, digging holes, carrying coal, smashing coal ash and performing manual farming work.  The manual labor at the prison was extremely painful. He felt as though he would die any day.  Although he was not beaten, per se, the hard labor at the prison camp was extremely difficult and was torture to Mr. Bae.

Six years prior to his arrest, Mr. Bae had been diagnosed with diabetes.  In 2000, he injured his back and neck and continued to have problems from that injury to the time of his imprisonment.  After being sentenced, he was taken to a hospital to determine whether he was physically able to serve 15 years of hard labor.  The

doctors examined him and determined that he could not do hard labor because of the disc problems in his neck and back.  In spite of that finding, however, he was transferred to the labor camp and put to work.  He was told by the prison officials that hard labor would be good for hm.

During his first three months in prison, Mr. Bae lost more than 50 pounds.  Both the manual labor and his being malnourished caused the weight loss and resulted in his being hospitalized.  During the remainder of his imprisonment, Bae told the DPRK officials about his diabetes and the problems which he had with his neck and back as a result of the hard labor.  His arthritic pain was particularly debilitating, often keeping him from getting what little sleep he might otherwise have been allowed.  He suffered from an inflamed gallbladder which was frequently debilitatingly painful.  Although he spent almost half of his imprisonment in a hospital in North Korea as a result of the torture and abuse he sustained, the officials largely ignored his complaints.  His condition got progressively worse.  The DPRK officials were unconcerned.

*See* Declaration of Kenneth Junho Bae, Ex. 1, ¶¶ 11-17.

### B. Lydia Yujin Bae

When Lydia Yujin Bae, ("Mrs. Bae") learned of her husband's arrest and imprisonment, she was immediately terrified.  She fell into a deep depression and, for months, spent much of her time in bed, unable to effectively function.  For the

next 735 days she lived with the knowledge that her husband was being held by a hostile regime which routinely tortures and kills its prisoners.  The resulting stress, grief and anger were overwhelming.

One manifestation of her grief was nightmares in which she saw her husband being tortured.  She regularly experienced those nightmares during his imprisonment.  She began taking sleeping pills in order to sleep given the stress and uncertainty of the situation and the recurrent nightmares from which she suffered.

Mrs. Bae and her husband had a missionary base in China.  When it closed, as a result of Mr. Bae's arrest, Mrs. Bae stayed home for 40 days and nights.  She could not go outside.  She was so afraid of receiving notice of her husband's torture or death  that she could not answer her phone and, in fact, turned it off.  She was not hungry due to her depression and lived on boiled cabbage to sustain herself.  Although she was depressed, she did not realize it at the time thinking that she was simply too weak to handle the situation.  She did not get any counseling until later.

When Mr. Bae was released and came home, Mrs. Bae was so exhausted and depressed that she could not care for or comfort him.  As a result, there was family discord which made life difficult.  Mrs. Bae went to the Addiction Psychology Institute in Korea and received daily treatment for three months to cope with life even though her husband was then home.  Since then, she has continued to go to counseling to help her with  her anxiety, tension and anger, all associated with Mr.

Bae's arrest and imprisonment.  After Mr. Bae was released, he and Mrs. Bae went to marriage counseling in Korea for six months in an effort to repair the damage done to their marriage by the DPRK.

Prior to her husband's arrest, Mrs. Bae had a thriving Korean traditional dress (hanboks) shop.  Ninety-five percent of her customer base were North Koreans who visited or worked in China.  When word of her husband's arrest became known, it was as if her shop had been blacklisted.  Nearly all of her customers stopped coming to the shop.  Her loss of income added significantly to the stress of her family since Mr. Bae was no longer able to provide the support which he had provided prior to his arrest.  The family finances contributed both to the economic hardship of the family and to the stress which all of the members of the family felt.

*See* Declaration of Lydia Yujin Bae, Ex. 2.

### C.  Jonathan Sang-Ou Bae

Jonathan Sang-Ou Bae ("Jonathan") is the son of Kenneth Bae.  At the time of his father's imprisonment, Jonathan was twenty-three years old.  Jonathan, like the other members of his family, was close to his father who was the leader of the family.  Mr. Bae's imprisonment was quite stressful for Jonathan.  Like the other members of the family, he knew that his father was being held by a hostile regime which had little regard for human life.

Immediately upon learning of his father's imprisonment, Jonathan began to advocate for his release. He contacted Bill Richardson (former United States Ambassador to the United Nations and frequent hostage negotiator); his local congressman, Ron Barber; the late senator John McCain; and basketball legend, Dennis Rodman. He was on weekly calls with representatives of the State Department. After a year of no apparent progress, Jonathan made a trip to Washington, D.C. to advocate for his father's release to members of Congress and representatives of the State Department.

During the first year of his father's imprisonment, life for Jonathan was particularly stressful. He quit his job in wireless sales and began abusing drugs to escape the pain he felt. He broke up with his girlfriend. All of these things were quite out of character for him. It took approximately a year for him to get his life back in order and to focus on both the release of his father and on his career as a sales representative at Sprint Mobile. Although, in retrospect, he realizes he should have received counseling during this period of time, he did not recognize the need at the time nor did he have the financial resources to pay for any counseling.

Jonathan was particularly concerned about his younger sister, Natalie, and the difficulties she was having. Although she had been a good student and athlete, her schoolwork began to suffer greatly. She developed mental health issues which she had not had previously and which required medication. In fact, she was

institutionalized after an attempted suicide.  Not only was the imprisonment of his father stressful, that stress was compounded by the effects of their father's imprisonment on Natalie.  Her suffering was hard on Jonathan as her older brother, having to watch her endure the emotional pain which she endured.

The State Department did not seem to be doing much to secure Mr. Bae's release.  It appeared to Jonathan that there was a lack of public support and governmental urgency both of which were quite discouraging to him.   Both contributed to Jonathan's sense of abandonment and despair, a sense that was shared by other members of the family.

Jonathan felt that his experience with his father being held by the regime of a ruthless dictator as political bait compared to that of a POW. He did not know how long his father would be held or if he would ever come home.  POWs were regarded highly by Americans.  There was sympathy and understanding for their plight.  In the case of his father, Jonathan felt that the public did not see his plight as that of a POW but instead of a reckless man in a place where he did not belong, even though the DPRK was his ancestorial home.  Every State Department call was a high stress situation.  Jonathan feared that the United States government would not care if the American people did not seem to care.  Fortunately, in the end, the United States government did secure Mr. Bae's release.   The stress and anguish of the

imprisonment ended after 735 days although the effect on Jonathan and his family continues to this day.

*See* Declaration of Jonathan Sang-Ou Bae Ex. 3.

### C. Natalie Haejin Bae

Natalie Haejin Bae ("Natalie") is the daughter of Kenneth Bae. Natalie was sixteen years old at the time of her father's arrest. She was attending high school at Benson High School in Benson, Arizona, where she was a good student and was involved in track and field among other extracurricular activities. Following her father's arrest, she lost interest in both her schoolwork and her athletic and extracurricular activities. She began working part-time at a sandwich shop to help support her family since her family no longer had the support of her father.

Natalie was later diagnosed with depression and anxiety requiring treatment with both Zoloft and Ativan. For 735 days, like the other members of her family, Natalie suffered knowing that her father was held by a hostile regime which routinely tortured and killed its political prisoners.

Even after her father's release, Natalie continued to suffer with anxiety and depression. She dropped out of the University of Arizona after only one semester. In 2016, she attempted suicide. Immediately after that she was mandatorily held at Palo Verde Behavioral Health Center for three weeks. Prior to her father's imprisonment, she had no mental health issues. His arrest and imprisonment were

overwhelming to her.  She continues to have bouts of depression and anxiety associated with the trauma of her father's imprisonment.

*See* Declaration of Natalie Haejin Bae, Ex. 4.

### E.  Terri Suhyun Chung

During the more than two years of Mr. Bae's imprisonment, his sister, Terri Suhyun Chung, ("Ms. Chung") became the primary advocate and media spokesperson for the family.  Ms. Chung had always had a close relationship with her brother, Kenneth.  His arrest and imprisonment was extraordinarily difficult for the entire family, including Ms. Chung.  For 735 days she lived with the knowledge that her brother was being held by a hostile regime which routinely tortured and killed its prisoners.  That knowledge was exacerbated by the fact that Mr. Bae had apparently been arrested because he was a Christian.  During the two years of his imprisonment, Ms. Chung worked tirelessly advocating for her brother's release and exposing the inhumane treatment of him by the DPRK.

At the time of Mr. Bae's imprisonment, Ms. Chung had two daughters, ages eleven and eight.  Being entirely consumed by leading Kenneth's rescue efforts, she was not available to her daughters physically or emotionally as she should have been.  She missed much of their daily routine and extra-curricular activities, such as concerts and soccer games, as her husband took on a disproportionate share of parenting and household responsibilities.  She was frequently away from her family

for long periods of time traveling to New York and Washington, D.C. to advocate for Mr. Bae with government and media outlets.

During that time, Ms. Chung served as the primary manager and spokesman for the "Free Kenneth Bae" campaign and as a family liaison to the United States government officials managing Mr. Bae's case.  As the family liaison, she participated in weekly phone calls with State Department officials and wrote letters to Presidents of the United States (both then current and former), the Secretary of State, members of the National Security Council, congressional leaders, public figures, and North Korea policy experts, pleading for their help.  She participated in telephone and in-person meetings with those who would grant them to her.  She wrote letters to the DPRK officials asking for Mr. Bae's pardon.

In addition, she managed the Facebook page, FreeKenNow.  That Facebook page sought to raise public awareness and support for Kenneth's plight and release. It further brought public light to the indifference of the DPRK and its heinous treatment of political prisoners like Kenneth Bae.

Ms. Chung translated and maintained detailed notes from correspondence with Mr. Bae, as those became the primary means of negotiation between the DPRK officials and the State Department.  She sought advice from North Korean policy experts, including the Center for Strategic and International Studies, the Council on Foreign Relations, the Albright Stonebridge Group, and the National Committee on

North Korea regarding how they interpreted the messages in Mr. Bae's letters and telephone calls and what might be best done to secure his release.  Her work with these organizations was tireless.

Ms. Chung also served as the family spokesperson for media engagements on national and local news outlets, including CNN, CBS, ABC, BBC and NPR.  These engagements were an ongoing part of her life during her brother's imprisonment. They were both difficult and stressful.  Ms. Chung found it extremely difficult to advocate for Kenneth's release with news outlets that did not have the same urgency that she had and, as a result, she became bitter toward them as she worked with them.

Despite all of the efforts to get the DPRK to cooperate and release Mr. Bae, nothing happened.  The uncertainty of his plight caused stress and anxiety for Ms. Chung and her family. She lived in fear for her brother's health and safety.  She was distraught when he was sentenced to fifteen years of hard labor and hospitalized multiple times during his imprisonment.  She also felt the emotional and physical burden of being the family spokesperson and manager for Kenneth's public media campaign while also maintaining a teaching position and parenting her daughters. During those two years she averaged five hours of sleep per night trying to keep up with what felt like three full-time jobs.  Despite her best efforts, she often felt hopeless as Mr. Bae's imprisonment dragged on for two years, with no apparent progress in obtaining his release.

Not only did Ms. Chung's physical health suffer, but her mental health also suffered. She was forced to take off work due to depression, anxiety and exhaustion associated with the traveling and the advocacy for her brother's release. After his release by the DPRK, Ms. Chung sought and received counseling for anxiety from 2015 continuing, with a one year interruption, to this day. Even though her brother has now been released, she continues to suffer from the trauma of the two years of his imprisonment.

*See* Declaration of Terri Suhyun Chung, Ex. 5.

### F.    Release

There were many people working to gain the release of Mr. Bae. These included, the United States government and the United Nations High Commission for Human Rights, both of which pressed the DPRK for information and the release of Mr. Bae. The Reverand Jesse Jackson wrote eleven letters to the DPRK government. The United States Ambassador to the United Nations, Bill Richardson, advocated for Mr. Bae's freedom. After James Clapper, the Director of National Intelligence, went to the DPRK as a special envoy along with a dozen or more people from the United States government, Mr. Bae was released with a special pardon by Kim Jong Un on November 8, 2014.

After his release from prison and return home, Mr. Bae was unable to work for two years because of his physical and emotional injuries. He sought marriage

counseling with his wife in an effort to repair their marriage; his wife also sought counseling for anxiety, tension and anger; his daughter Natalie continues counseling following her suicide attempt; and his sister Terri Chung sought and continues counseling for anxiety from 2015 to now, with the exception of a one year gap in the counseling.

Physically, Mr. Bae's diabetes has worsened, with his having to take insulin shots twice a day where previously he was not on insulin. His neck and back pain worsened resulting in his hospitalization. In addition to his worsening diabetes and back pain, Mr. Bae had prostate and bladder surgery following his return to the United States as a result of the physical torture and malnutrition he experienced in the DPRK labor camp.

Returning to work two years after his release and moving to South Korea, Mr. Bae founded Nehemiah Global Initiative (NGI), an NGO formed to advocate for the people of the DPRK and to serve the DPRK refugees. Though he is the American held longest by the DPRK since the Korean War, Mr. Bae continues to advocate for the people of North Korea in spite of his physical problems caused and exacerbated by the torture to which he was subjected.

*See* Declaration of Kenneth Junho Bae. Ex.1; *See* Declaration of Jonathan Sang-Ou Bae. Ex. 3; *See* Declaration of Terri Suhyun Chung, Ex. 5.

## II.    PERSONAL JURISDICTION OVER THE DPRK AND SERVICE OF PROCESS

Courts have personal jurisdiction over a foreign state when that state has been served in accordance with 28 U.S.C. § 1608.  *See* 28 U.S.C. § 1330(b); *TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 296, 299 (D.C. Cir. 2005); *see also* Fed. R. Civ. P. 4(j)(1) (requiring that foreign states be served in accordance with 28 U.S.C. § 1608).

In this case, service of process on the DPRK was obtained pursuant to this Court's Minute Order dated December 4, 2023.  Because the United States does not maintain diplomatic relations with the government of the DPRK, the documents were mailed by the Clerk of Court, via Federal Express to the Foreign Minister Choe Son-Hui c/o Ambassador Kim Song, Perm. Mission of the Democratic People's Republic Korea UN, 820 Second Avenue 13th Floor, New York, NY 10017 on December 20, 2023 (ECF 33).  In addition, counsel for Plaintiffs mailed the documents via Federal Express, to the Foreign Minister Choe Son-Hui c/o Ambassador Kim Song, Perm. Mission of the Democratic People's Republic Korea UN, 820 Second Avenue 13th Floor, New York, NY 10017, on December 20, 2023. This Federal Express package was delivered to the Receptionist at the Perm. Mission of the DPRK. (*See* Ex. 6)  Service by publication was accomplished on the Defendant via X (formerly known as Twitter) on January 3, 2024. (ECF No. 34)  As

a result of this service of process, this Court has personal jurisdiction over the Defendant.

On March 19, 2024, the Clerk of Court entered a default against the Defendant. (ECF No. 37)

### III.  Subject Matter Jurisdiction Under 28 U.S.C. § 1605A

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq*., provides the exclusive basis for subject matter jurisdiction over all civil actions against foreign states.  28 U.S.C. §§ 1330, 1602-1611.  Section 1604 of Title 28 provides that foreign states are "immune from the jurisdiction of the courts of the United States except as provided in section 1605-1607 of this chapter."   The exception applicable to this case is found in 28 U.S.C. § 1605A(a)(1), which provides that foreign states are not immune from the jurisdiction of United States courts where a claimant seeks money damages for personal injury or death  "caused by an act of torture [or]  .  .  .  hostage taking" where the injury or death is attributable to the foreign state's employees or agents or the foreign state's material support of such acts.

Federal courts shall hear a claim under 28 U.S.C. § 1605A if the following three subject matter jurisdictional criteria are met:

- The foreign state was designated as a state sponsor of terrorism at the time the act . . ., or was so designated as a result of such act.  28 U.S.C. § 1605A(a)(2)(A)(i)(I)

- The claimant or the victim was, at the time of the foreign state's act, a national of the United States, or an individual performing a contract awarded by the United States government, acting within the scope of the employee's employment.  28 U.S.C. § 1605A(a)(2)(A)(ii)(I) and (III).

- In cases in which the act occurred in the foreign state, the claimant has "afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration."  28 U.S.C. 1605A(a)(2)(A)(iii).

Each of these jurisdictional prerequisites has been met in this case.

### A.  The DPRK is a State Sponsor of Terrorism (28 U.S.C. § 1605A(a)(2)(A)(i)(I))

The DPRK was formally declared a "state sponsor of terrorism" in 1988, by the Secretary of State, in accordance with section 6(j) of the Export Administration Act of 1979; North Korea, 53 Fed. Reg. 3977-01 (Feb. 5, 1988).  The State Department, however, rescinded that determination in 2008.  See Rescission of Determination Regarding North Korea, 73 Fed. Reg. 63540-01 (October 24, 2008). The State Department then redesignated North Korea as a state sponsor of terrorism in November 2017.  That designation has not been rescinded.  *See* Democratic

People's Republic of Korea (DPRK) Designation as a State Sponsor of Terrorism (SST), 82 Fed. Reg 56100-01 ( November 2017). North Korea thus "remained so designated when" the Plaintiffs filed their claims on August 17, 2020. *See 28 U.S.C. 1605A(a)(2)(A)(i)(I).*

Notwithstanding that the DPRK was not designated as a state sponsor of terrorism at the time of Mr. Bae's detention in November, 2012, or by the time of his subsequent release in November, 2014, subject matter jurisdiction is established if the foreign state was designated as a state sponsor of terrorism "as a result of such act." *See* 28 U.S.C. 1605 A(a)(2)(A)(i)(I). Here, the State Department's designation of North Korea as a state sponsor of terrorism was, at least in part, a result of North Korea's detention and mistreatment of Mr. Bae which is sufficient to meet the state sponsor of terrorism requirement.

The declarations submitted in support of this motion establish that members of Mr. Bae's family lobbied the State Department and congressional officials seeking their aid in the release of Mr. Bae from his illegitimate detention. The family's advocacy for Mr. Bae's release noted the inhumane treatment to which he was subjected – that inhumane treatment ultimately combining with other similar events to have the DPRK again designated as a state sponsor of terror. *See* Declaration of Jonathan Sang-Ou Bae, Ex. 3, ⫪ 5, 9-10; Declaration of Natalie Haejin Bae, Ex. 4, ⫪ 6 and Declaration of Terri Suhyun Chung, Ex. 5, ⫪ 5, 7-16.

On October 20, 2027, sixteen congressmen wrote a letter to the Secretary of State stating "We write to urge you to exercise your authority to relist North Korea as a state sponsor of terrorism. Further noting that since North Korea was removed from the state sponsor of terrorism list in 2008, the Kim regime has repeatedly perpetrated or supported heinous acts, the most recent illegitimate detention, murderous mistreatment and tragic death of Otto Warmbier." *See Warmbier at pg. 45*. One of those heinous, illegitimate acts was the detention of Kenneth Bae. In addition to the tragic treatment of Otto Warmbier, Mr. Bae's detention supported the addition of North Korea to the list of state sponsors of terrorism. For purposes of this claim, the DPRK is a state sponsor of terror.

### 2. Plaintiffs are Nationals of the United States (28 U.S.C. § 1605A(a)(2)(A)(ii)(I)

Mr. Bae, his wife, his two children and his sister are all nationals of the United States. *See* Kenneth Junho Bae Declaration, Ex. 1, ⊩2; Lydia Yujin Bae Declaration, Ex. 2, ⊩ 1; Jonathan Sang-Ou Bae Declaration, Ex. 3, ⊩ 1; Natalie Haejin Bae, Declaration, Ex. 4, ⊩ 1; and Terri Suhyun Chung, Declaration, Ex. 5, ⊩ 1.

### 3. Plaintiffs Afforded the DPRK an Opportunity to Arbitrate (28 U.S.C. § 1605A(a)(2)(A)(iii))

The Bae family offered the DPRK a reasonable opportunity to arbitrate the claims in this action. The offer to arbitrate required by the statute "need not precede the filing of the complaint." *See Simpson v. Socialist People's Libyan Arab*

*Jamahiriya*, 326 F.3d 230, 233 (D.C. Cir. 2003) (holding that an offer to arbitrate made after the filing of the complaint was a reasonable offer); *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 159 (D.D.C. 2017). An Offer to Arbitrate was included with the Complaint which, as described above, was served on the DPRK on December 21, 2023, by mail when FedEx delivered the package containing the Summons, Complaint, and Notice of Suit, together with a translation of each into the official language of the foreign state. The Offer to Arbitrate stated:

> Pursuant to 28 U.S.C. § 1605A(a)(2)(iii), Plaintiffs offer to submit the claims in this action to arbitration in accordance with accepted international rules of arbitration. Defendant, the Democratic People's Republic of Korea, may accept this offer to arbitrate within sixty (60) days of receipt of this offer by:
>
> 1. Notifying the undersigned counsel, in writing, of Defendant's acceptance; or
>
> 2. Filing a written acceptance with the Clerk of this Court.
>
> Defendant's failure to comply with the accepted procedures set forth above shall constitute a rejection by the Democratic People's Republic of Korea of a reasonable opportunity to arbitrate these claims.

(*See* Offer to Arbitrate, ECF Doc. 5)

This Offer to Arbitrate fully satisfies the offer to arbitrate requirement under FSIA. *See Asemani v. Islamic Republic of Iran*, 266 F. Supp. 2d 24 (D.D.C. 2003)

(finding that service of an offer to arbitrate on the DPRK's interest section at the embassy in Washington, D.C. is sufficient).

## IV.  LIABILITY AND SCOPE OF DAMAGES

The FSIA specifically authorizes a private right of action against a foreign state that is a state sponsor of terrorism as described in 28 U.S.C. §1605A(a)(2)(A)(i) and provides that the foreign state shall be liable to a United States national or the legal representative of such person for personal injury or death caused by the foreign state's torture or hostage taking.  28 U.S.C. §1605A(c).  This subsection extends liability to the foreign state if the torture or hostage taking is committed by an official, employee or agent of the foreign state:  "In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents."  The statute allows the recovery of money damages for a variety of claims, including "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C § 1605A(c).

Plaintiffs Kenneth Junho Bae, Lydia Yujin Bae, Jonathan Sang-Ou Bae, Natalie Haejin Bae and Terri Suhyun Chung have brought claims for compensatory damages to include mental anguish and emotional distress.  The Plaintiffs also seek punitive damages.  The emotional damages suffered by each of the Plaintiffs is described in Section I above and in their respective Declarations. (See Kenneth

Junho Bae, Ex. 1; Lydia Yujin Bae, Ex. 2; Jonathan Sang-Ou Bae, Ex. 3; Natalie

Haejin Bae, Ex. 4 ; and Terri Suhyun Bae, Ex. 5.)

### A.  Evidence of Torture and Hostage Taking
### 1.  Evidentiary Standard

Section 1605(A)(a)(1) requires proof of torture or hostage taking.  Any

discussion of the evidence of the DPRK's responsibility for torture and hostage

taking in this case should begin with the applicable evidentiary standards.  The

statute requires that a claimant "establish his claim or right to relief by evidence

satisfactory to the court." 28 U.S.C. § 1608(e); *see also Owens v. Republic of Sudan*,

864 F.3d 751, 784-85 (D.C. Cir. 2017) (describing claimants' burden as a "rather

modest burden of production to establish the court's jurisdiction").  In meeting this

standard, Plaintiffs are not limited to evidence that would be admissible at trial.  In

*Owens*, this Court stated:

> The district court also has an unusual degree of discretion
> over evidentiary rulings in a FSIA case against a
> defaulting state sponsor of terrorism.  For example we
> have allowed plaintiffs to prove their claims using
> evidence that might not be admissible in a trial . . . Section
> 1608(e) does not require a court to step into the shoes of
> the defaulting party and pursue every possible evidentiary
> challenge, only where the court relies upon evidence that
> is clearly inadmissible and essential to the outcome has it
> abused its discretion.

With this objective in mind, the D.C. Cir. has instructed that "courts have the

authority – indeed, we think, the obligation – to adjust evidentiary requirements to…

differing situations." *Id* at 1048 parent quoting *Bundy v. Jackson*, 641 F. 2nd 934, 951(DCC 1981)).

This Court has held that in a FSIA default proceeding, a district court can find that the evidence presented to satisfactory "when the plaintiff shows her claim has some factual basis,… even if she might not have prevailed in a contested proceeding." *See Owens* at 785. *See also Warmbier v. Democratic People's Republic of Korea*, 3656 F. Supp. 3rd 30 (DDC 2018). While the FSIA leaves it to the court to determine precisely how much and what kind of evidence the Plaintiff must provide, courts must be mindful that Congress enacted Section 1605A, FSIA's terrorism exception, and Section 1608(e) with the aim "to prevent state sponsors of terrorism – entities particularly unlikely to submit to this country's laws – from escaping liability for their sins." *See Han Kim v. Democratic People's Republic of Korea,* 774 F.3d 1044, 1047-48 (D.C. Cir. 2014). The evidence presented by these Plaintiffs meets this evidentiary standard. Mr. Bae has described his detention, torture and hostage taking. Each of his family members have described the affect of his imprisonment on them.

### 2. Definition of "Torture"

FSIA adopts the definition of "torture" found in the Torture Victim Protection Act of 1991. 28 U.S.C. § 1605A(h). That definition states in pertinent part:

> (1)    The term "torture" means any act directed against an individual in the offender's custody or physical control,

> by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to lawful sanctions) whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed intimidating or coercing that individual or a third person or for any reason based on discrimination of any kind  . . .

Pub. L 102-256, Mar. 12, 1992, 106 Stat. 73*; see also Hekmati, supra*.   The applicable definition of torture includes both physical and mental torture.   *See, e.g., Acree v. Republic of Iraq*, 271 F. Supp. 2d 179, 216 (D.D.C. 2003) (finding that Iraq's treatment of American POW's constituted mental torture based on acts including denial of requests to notify family members, use of forced propaganda tapes by injured POW's, and refusal to let the Red Cross inspect the prisoners conditions); *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 67-68 (D.D.C. 2015) (finding of mental torture based on threats to kill if prisoner refused to confess); *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 25 (D.D.C. 2001) (finding of torture based on prisoners being held at gunpoint, threatened with physical injury for failing to confess, and incarcerated in a room with no bed, window, light, electricity, water, toilet or adequate access to sanitary facilities).

There is no bright line definition of torture.   It is a matter of degree.   The D.C. Circuit has held that "[t]he critical issue is the degree of pain and suffering that the alleged torturer intended to and actually did, inflict upon the victim.   The more intense,

lasting or heinous the agony, the more likely it is to be torture." *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 92-93 (D.C. Cir. 2002).

The Declaration of Mr. Bae (Ex. 1) establishes the torture which he sustained and which is compensable under the FSIA. Mr. Bae's is not an isolated case. Indeed, other Courts in this district have found that the DPRK tortures American citizens held in its prisons. *See, e.g., Warmbier,* 356 *F. Supp.*3d 30 (D.D.C. 2008).

### 3.  Hostage Taking

Another basis for jurisdiction under FSIA is hostage taking. *See* 28 U.S.C. § 1605(A)(a)(1). The D.C. Circuit has stated that "hostage taking occurs under . . . [FSIA] when a person seizes or detains and threatens to kill, to injure or to continue to detain another person in order to compel a third party  .  .  .  to do or abstain from doing any act as an explicit or implicit condition for release of the hostage." *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 470 F.3d 356, 420 (D.C. Cir. 2006); *see also Wyatt v. Syrian Arab Republic*, 362 F. Supp. 2d 103, 112 (D.D.C. 2005). As described Section I above, the DPRK held Mr. Bae and used him as a pawn to negotiate with the United States in an effort to extract political and economic concessions from the United States. He was told that the DPRK government wanted an ex-President or cabinet-level member of the United States government to come to the DPRK, apologize for his acts to overthrow the government of the DPRK and compensate the DPRK for the wrong it had endured. The DPRK officials wanted

someone like former President Clinton to come to his rescue and apologize on behalf of the people and government of the United States. When the DPRK authorities did not like the response of the United States government to its demands, it would cut off Mr. Bae's contact with his family members and would withhold letters from the family and from others around the world.

It is important to note that the decades long negotiations between the DPRK and the United States to halt North Korea's nuclear and missile program fell apart in 2012 when North Korea launched a rocket and displayed road-mobile ICBMs at a military parade.  Shortly thereafter the DPRK resumed nuclear testing in 2013 and Mr. Bae became a political pawn for the DPRK to use in order to gain recognition and concessions from the United States.  Mr. Bae was held as a hostage within the meaning of 28 U.S.C. § 1605(A)(a)(1).

### B.  Liability for Solatium/Intentional Infliction of Emotional Distress

Both solatium damages and punitive damages are specifically provided for in the statute.  Solatium claims under FSIA "are functionally identical to claims for intentional infliction of emotional distress." *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 27 (D.D.C. 2014).

In the past, claims for emotional distress under FSIA were based on the state law of the victim's residence.  *See, e.g., Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 62-63 (D.D.C. 2006).  In 2008, however, the applicable statutes were

amended to create the federal causes of action found in § 1605A(c).  *See Owens v. Republic of Sudan*, 864 F.3d at 807-809.

Solatium damages have been described as damages "for mental anguish, bereavement and grief that those with a close personal relationship" to a decedent or person held and tortured have suffered.  These damages are also appropriate to compensate those closely-related persons for "the harm caused by the loss of decedents' society and comfort."  *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d at 72.  In awarding solatium damages, "Courts may presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish and testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages." *Kim v. Democratic Republic Of Korea*, 87 F. Supp. 3d at 290;  *see also Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 114 (D.D.C. 2000)(awarding solatium damages to both the wife and daughter of a victim who was tortured and held for six and a half years); *Cicippio v. Islamic Republic of Iran*, 18 F. Supp. 2d 62, 70 (D.D.C. 1998)(awarding solatium damages to the wife of a torture victim held for 44 months).

The imprisoned Plaintiff in this case, Kenneth Bae, is the direct victim of the DPRK's cruelty, physical and mental torture and malnutrition. Mr. Bae's wife, Lydia Yujin Bae, and his children, Jonathan Sang-Ou Bae and Natalie Haejin Bae, are also Plaintiffs in this action.  Their mental anguish and suffering is described in Section

I above.  Mrs. Bae and the Bae children were part of a close and loving family but were deprived for 735 days of the love and companionship of the father they loved. That deprivation has taken a significant emotional toll on each of them.  *See* Declarations of the Lydia Yujin Bae. Ex. 2, and of the Bae children; Jonathan Sang-Ou Bae, Ex. 3; and Natalie Haejin Bae, Ex. 4.

Finally, Terri Suhyun Chung, the sister of Mr.  Bae is a Plaintiff and was also a part of this close and loving family, she suffered mental anguish and grief.  For 735 days she was deprived of the love and companionship of her brother.  *See* Declaration of Terri Suhyun Chung, Ex. 5.

These Plaintiffs all meet the statutory requirements for compensation. Moreover, they deserve to be compensated for the horror that the DPRK has visited upon them.

### B.  Liability for Punitive Damages

The FSIA statute also provides for punitive damages.  28 U.S.C. § 1605(c). Punitive damages under FSIA are intended to "punish and deter the actions for which they are awarded."  *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 55-56 (D.D.C. 2012); *see also Kim v. Democratic Republic of Korea, supra,* at 290-91 ("Punitive damages are not meant to compensate the victim, but [are] instead meant to award the victim an amount of money that will punish outrageous behavior and deter such outrageous conduct in the future.")

The DPRK is not easily deterred from its heinous acts of terror and torture. *See Warmbier v. Democratic People's Republic of Korea,* 356 F. Supp. 3rd 30 (D. D. C. 2018) and *Kim v. Democratic Republic Of Korea*, 87 F. Supp. 3d at 290. Only a substantial award of punitive damages has any chance of any deterrent effect on its outrageous, inhumane conduct.

## V.  QUANTUM OF DAMAGES

Factors to be considered in determining an appropriate award of damages include the cause of action, each Plaintiff's individual circumstances, and the history of awards in this circuit for similarly situated Plaintiffs.  *See, e.g., Kim v. Democratic Peoples Republic of Korea*, *supra,* at 290-91.

### A.  Solatium/Intentional Infliction of Emotional Distress Damages as to Kenneth Junho Bae

Mr. Bae  was imprisoned for 735 days. While he had some communication with his wife, his two children and his sister, his friends, international aid organizations, and his government through written letters, that contact was limited and was used by the DPRK in an effort to bargain with the United States government on political and economic issues.  At times the letters were withheld because the officials did not like responses received from the United States officials to their

demands.  Mr. Bae lost substantial touch with both his family and his life for 735 grueling, torture filled days.

He was tortured by being forced to perform manual labor, which included carrying rocks and coal, digging holes, smashing coal into ash for hours and performing manual farming work, all while malnourished.  He was deprived of sleep, forced to stand still in his room for entire days and to kneel on the concrete floor for hours.  He was threatened with death by decapitation with his body to then be buried so no one would ever recover it.  He was told that the United States government had forgotten him and that he would never be allowed to go home and that he would suffer and die in prison.  He was forced to watch propaganda TV for 13 hours on Sundays and read books and newspapers about the North Korean ideology called Ju Che each of the remaining days of every week in solitary confinement.   He was not allowed contact with other prisoners and ate all of his meals alone.  It is difficult to put into words the misery and torture that was mercilessly inflicted on Mr. Bae.

In deciding an appropriate damages award in FSIA claims, courts have regularly considered damages claims in similar cases and then adjusted those claims to fit the particular circumstances of the case before them.  There are two cases that most closely approximate the circumstances of this case.  These are *Cicippio v. Islamic Republic of Iran*, 18 F. Supp. 2d 62 (D.D.C. 1998) and *Anderson v. Islamic*

*Republic of Iran*, 90 F. Supp. 2d 107 (D.D.C. 2000).  Both *Anderson* and *Cicippio* involved American citizens who were kidnapped and tortured by agents acting on behalf of Iran.  The claimant in *Cicippio* was held for over five years before being released; the claimant in *Anderson* was held for six and a half years (2,454 days) before being released.  Mr. Bae was  held for 735 days  The court awarded the claimant in *Cicippio* $20 million in compensatory damages.  *See Cicippio* at p. 69. The claimant in *Anderson* was awarded $24.5 million in compensatory damages. *See Anderson* at p. 113.  Given these precedents and the aggravating circumstances of Mr. Bae's torture and captivity, Plaintiffs suggest an award of $7.35 million for Mr. Bae, that amount being $10,000 for each day he was held.

### B.  Solatium/Intentional Infliction of Emotional Distress Damages as to Lydia Yujin Bae

For 735 days, Mrs. Bae was deprived of the love and comfort of her husband. She was constantly reminded that the DPRK routinely tortures its prisoners.  She had very little contact with him for those 735 days.  The contact she had was writing him letters. She worked diligently for his release.  It is difficult to imagine more painful circumstances. In *Cicippio*, the wives of the two prisoners were awarded $10 million each for their husbands' imprisonment for just over five years.  *Cicippio*, *supra,* at 69.  In *Anderson*, Mr. Anderson's wife was awarded $10 million as a result

of her husband's imprisonment for just over six and a half years.  Plaintiffs suggest

an award of $3.7 million would be an appropriate award in this case for Mrs. Bae.

### C.  Solatium/Intentional Infliction of Emotional Distress Damages for the Children of Kenneth Bae and the Sister of Kenneth Bae

Courts in this circuit have presumed "that those in direct lineal relationships

with victims of terror suffer compensable mental anguish . . ."  *Oveissi v. Islamic*

*Republic of Iran,* 768 F. Supp. 2d 16, 25 (D.D.C. 2011); *see also Kim v. Democratic*

*People's Republic Of Korea*, *supra,* at 290 ("While it is difficult to quantify the grief

that [Reverend Kim's children] have experienced and continue to experience as a

result of North Korea's violent actions, these Plaintiffs are entitled to compensation

for their loss, pain, mental anguish, and suffering").   In *Kim*, the two children of

North Korea's victim, Reverend Kim Dong Shik, were each awarded $15 million in

compensatory damages.  *Kim, supra,* at 291.  In *Anderson*, the daughter of Iran's

victim, Terry Anderson, was awarded $6.7 million.   *Anderson*, *supra*, at 113.

Plaintiffs suggest an award of $3 million to each of Mr. Bae's children and for his

sister.

### D.  Punitive Damages

While Courts have routinely awarded punitive damages in FSIA cases, they

have used different methodologies in determining an appropriate amount.  *See, e.g.,*

*Warmbier v. Democratic People's Republic of Korea,* 356 F. Supp. 3d 30 (D. D. C.

2018)*;  Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 86-87 (D.D.C. 2017);

and *Levinson v. Islamic Republic of Iran,* 443 F. Supp. 3d 158(2020).  In determining both an appropriate methodology and the amount of a punitive damages award, the court is required to consider certain factors.  These are "(1) the character of the defendant's act (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause (3) the need for deterrence, and (4) the wealth of the defendants."  *Warmbier*, *supra at* 44.  In this case, each of these factors weighs in favor of a substantial punitive damages award.[1]  The DPRK's actions were abhorrent.  It  locked a man in a  prison, tortured him both physically and mentally denying him access to his family and his country.

The DPRK further denied his wife, two children and sister access to, and knowledge of, their husband, father and brother for 735 long days.  The harm the DPRK has caused this family is immeasurable.  For 735 days, Mr. Bae's family struggled to gain the release of their husband, father and brother.  The Bae family was immersed in a never-ending nightmare from which they saw no escape.  The DPRK's behavior must be deterred.  It is part of a long pattern of illegal detention and torture that defies international and civilized norms. The DPRK is a vast nation with substantial resources.  Only a substantial punitive damages award has any chance of deterring their behavior.

---

[1] In FSIA cases, "foreign sovereigns cannot use the constitutional constraints of the Fifth Amendment due process clause to shield themselves from large punitive damages awards."  *Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93, 106 (D.D.C. 2012).

In a recent case with similarly egregious facts, the court chose to award punitive damages of $150,000,000 each to the mother, father and estate of the victim, Otto Warmbier, for a total punitive damages award of $450,000,000. *Warmbier, supra* at 44-46. The court in *Warmbier* chose that amount because the acts committed by North Korea were "awful and worthy of the gravest condemnation" and because "North Korea is heavily aware of the political environment in the United States, including judgments issued by United States courts." The same can be said of the DPRK's actions in this case. The DPRK is not easily deterred. Its conduct should be punished substantially. Plaintiffs in this case would therefore suggest a punitive damages award of $150 million to each of the Plaintiffs, for a total punitive damages award of $750 million.

## CONCLUSION

Plaintiffs respectfully request that this Court enter a default final judgment in their favor and against Defendant. This Court has personal jurisdiction over Defendant, as well as subject matter jurisdiction over the claims in this action. Defendant, despite being provided notice and an opportunity to be heard, has declined to defend this action. The Defendant's silence speaks volumes about its culpability.

The Plaintiffs' damages are compelling and significant. Mr. Bae was held prisoner and subjected to inhumane torture for 735 days. The Defendant's actions

similarly held Mr. Bae's family prisoner, with only a fleeting hope that they might ever have seen their husband, father and brother again.  Likewise, Defendant's actions have subjected Mr. Bae's family to a different—but no less cruel—form of psychological torture.  The facts before the Court demonstrate that Plaintiffs are fully entitled to the recovery of substantial monetary damages for Defendant's outrageous behavior and are further entitled to punitive damages as described above in an effort to deter similar conduct in the future .

Accordingly, Plaintiffs request that this Court award the following monetary damages:

    A.    To Kenneth Junho Bae:

        1.    Non-Economic Damages:  $7.35 million

        2.    Punitive Damages: $150 million

    B.    To Lydia Yujin Bae:

        1.    Non-Economic Damages:  $3.7 million

        2.    Punitive Damages: $150 million

    C.    To Jonathan Sang-Ou Bae:

        1.    Non-Economic Damages:  $3 million

        2.    Punitive Damages: $150 million

    D.    To Natalie Haejin Bae:

        1.    Non-Economic Damages:  $3 million

2.    Punitive Damages: $150 million

E.    To Terri Suhyun Chung:

1.    Non-Economic Damages:  $3 million

2.    Punitive Damages: $150 million

F.    Total Damages Award        $770.05 million

Respectfully submitted,

*/s/ J. Nixon Daniel, III*
J. Nixon Daniel, III
D.C. Bar No. FL0031
jnd@beggslane.com
David L. McGee
D.C. Bar No. FL0037
dlm@beggslane.com
Matthew P. Massey
D.C Bar No. 1023608
mpm@beggslane.com
Beggs & Lane, RLLP
501 Commendencia Street
Pensacola, FL 32502
(850) 432-2451
Attorneys for Plaintiffs